**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

MARION V. SMITH,

                Plaintiff,

v.                                    CIVIL ACTION NO.  2:10-cv-00354

BAC HOME LOANS SERVICING, LP, et al.,

                Defendant.

**MEMORANDUM OPINION AND ORDER**

Pending before the court is the Motion for Summary Judgment filed by the defendant, BAC Home Loans Servicing, LP ("BAC") [Docket 22].  BAC's position rests primarily on preemption, an important constitutional doctrine that draws its force from the Supremacy Clause of the U.S. Constitution.  Preemption reflects the principle that, in the collective wisdom of Congress, the laws of the several States must sometimes give way to a set of nationally uniform rules and regulations.  Nevertheless, because part of the genius of our constitutional Republic stems from its preservation of dual sovereigns, federal preemption of state law is not something to be undertaken lightly.  BAC's briefing accords these principles little weight.

BAC's preemption theory is grounded, not on the text of the statute in question or the specific purposes set forth therein, but rather on an amalgamation of agency regulations, inapposite case law, and public policy arguments.  In the face of statutory silence, BAC justifies the displacement of two state-law causes of action by reading an agency regulation in a way that does violence to both the

statute authorizing the regulation and the relevant precedent.  Because recent Supreme Court decisions undermine BAC's position, I reject it.  Accordingly, BAC's Motion for Summary Judgment is **DENIED.**

## I.      Background

This case arises out of the servicing of a home loan agreement.  On June 26, 2007, the plaintiff, Marion Smith, entered into a loan agreement with Countrywide Home Loans, Inc. ("Countrywide").  Pursuant to this loan agreement, the plaintiff executed a Note in the amount of $97,000 payable to Countrywide.  The plaintiff also executed a Deed of Trust conveying her home, located in Ripley, West Virginia, as security for repayment of the Note.  At some point, BAC became the servicer for the plaintiff's loan.

In 2008, the plaintiff fell behind on her payments, and she defaulted on her loan agreement in October 2008.  In spring 2009, the plaintiff received two notices from Gordon & Amos, a law firm retained by Countrywide and Bank of America to conduct a "nonjudicial foreclosure."  (Defs.' Mot. For Sum. J. Ex. C [Docket 22-3], at 11-13.)  The first letter, dated May 13, 2009, informed the plaintiff that her loan was in default and stated that "the creditor requests payment for the amount of 'debt reinstatement' listed above [$5,504.54] on or before June 12, 2009 to prevent foreclosure." (*Id.* at 11.)  The second letter, dated June 25, 2009, notified the plaintiff that a trustee sale of her property was scheduled for July 20, 2009.  (*Id.*)

The plaintiff contacted BAC to request a loan modification and, on July 11, 2009, BAC sent the plaintiff a letter stating that loan modification had been approved and that "[i]n order for the modification to be valid, the enclosed documents need to be signed and returned."  (Pl.'s Resp. Mot.

Sum. J. Ex. D [Docket 28-4], at 1.)  The plaintiff completed and mailed the documents to BAC, which now concedes that it received these documents from the plaintiff.[1]

The plaintiff asserts that she made timely payments pursuant to the loan modification agreement beginning in September 2009.  In December 2009, BAC contacted the plaintiff by phone to inform her that she was in default on the loan.  The plaintiff then contacted Gordon & Amos, who informed her that her home was in foreclosure and set for foreclosure sale on February 8, 2010.  The plaintiff also contacted Robert Fisher, the attorney who conducted the original loan closing.  Mr. Fisher made inquiries of BAC on the plaintiff's behalf without success.

On February 9, 2010, the plaintiff filed suit in the Circuit Court of Jackson County, West Virginia against the defendants, BAC and John Doe Holder.[2]  The plaintiff's Complaint asserts three causes of action, one for breach of contract, and two for violations of the West Virginia Consumer Credit and Protection Act (the "WVCCPA").  Count One contains a claim for breach of the loan modification agreement.  Count Two asserts that the defendants "failed to provide the Plaintiff with a Notice of Right to Cure and pursued foreclosure on the Plaintiff's home despite the fact that she was not in default," and "made false and misleading representations in violation of West Virginia Code section 46A-2-127." (Compl. [Docket 1-1] ¶¶ 25-26.)  Count Three asserts that by "pursuing foreclosure when Plaintiff was not in default, Defendants used unconscionable means to collect a debt, in violation of West Virginia Code section 46A-2-128."  (Compl. [Docket 1-1] ¶ 28.)  On

---

[1] BAC now acknowledges that there are genuinely disputed material facts as to the contract and has, accordingly, withdrawn its Motion for Summary Judgment regarding the plaintiff's breach of contract claim.

[2] "John Doe Holder" is not identified by the parties, and it is not clear from the record who currently holds the Note.  As the plaintiff's claims arise out of BAC's *servicing* of the loan, John Doe Holder's absence is not material to the plaintiff's claims.

March 18, 2010, BAC filed a timely notice of removal in this court asserting diversity of citizenship jurisdiction under 28 U.S.C. § 1332.[3]

On January 28, 2011, BAC filed a Motion for Summary Judgment on all of the plaintiff's claims.[4]  Subsequent discovery revealed that BAC had received a copy of the plaintiff's loan modification paperwork, and BAC then withdrew the portion of its Motion pertaining to the plaintiff's breach of contract claim.  BAC maintains, however, that it is entitled to summary judgment on the plaintiff's two claims for statutory violations of the WVCCPA because they are preempted by federal law.  BAC further contends that, even if the plaintiff's WVCCPA claims are not preempted by federal law, BAC is nonetheless entitled to judgment because these claims are not supported by the evidence.

## II.    Legal Standard

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  In considering a motion for summary judgment, the court will not "weigh the evidence and determine the truth of the matter."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  Instead, the court will draw any permissible inference from the underlying facts in the light most

---

[3] Because this case arises from diversity jurisdiction, the plaintiff's state-law claims are controlled by West Virginia's substantive law.  *See Homeland Training Ctr., LLC v. Summit Point Auto. Research Ctr.*, 594 F.3d 285, 290 (4th Cir. 2010).  Preemption is a question of federal law originating from the Constitution, however, and thus the analysis of that issue depends on federal law.

[4] On March 7, 2011, the plaintiff filed a Motion to Supplement Memorandum of Law in Response to Defendant's Motion for Summary Judgment [Docket 32].  The court does not find it necessary to consider the plaintiff's supplemental materials, and, accordingly, **DENIES** this Motion as moot.

favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

Although the court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor." *Anderson*, 477 U.S. at 256. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make a showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. *Anderson*, 477 U.S. at 252. Likewise, conclusory allegations or unsupported speculation, without more, are insufficient to preclude the granting of a summary judgment motion. *See Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987); *Ross v. Comm'ns Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985), *abrogated on other grounds*, 490 U.S. 228 (1989).

## III.   Analysis

### A.   Preemption Arguments

BAC seeks summary judgment on the plaintiff's two statutory claims under the WVCCPA. The plaintiff alleges that in foreclosing on her home when she was not in default, BAC made various misrepresentations in violation of West Virginia Code § 46A-2-127, and used unconscionable means to collect a debt in violation of § 46A-2-128 of the Code. BAC maintains that both of these claims are preempted by some amalgamation of the National Bank Act (the "NBA") and the regulations promulgated thereunder by the Office of the Comptroller of the Currency (the "OCC"). In explaining why BAC's preemption argument is mistaken, I will address three topics: (1) the general

principles governing federal preemption, (2) the preemptive aspects of the NBA and the OCC's regulations thereunder, and (3) the application of those principles to the plaintiff's WVCCPA claims.

      1.    *General Principles Governing Federal Preemption*

The concept of federal preemption originates in the Constitution's Supremacy Clause. *See* U.S. Const. art. VI, cl. 2.[5]  I will address three issues in describing the scope of this important constitutional doctrine. I begin with two cardinal principles underlying preemption law. I then summarize the various types of preemption. Finally, I discuss the role that agency regulations play in preemption analysis.

      a.    <u>Cornerstones of Preemption Jurisprudence</u>

The Supreme Court has recently reemphasized "two cornerstones" of its preemption jurisprudence. *Wyeth v. Levine*, 129 S. Ct. 1187, 1194 (2009).  First, "the purpose of Congress is the ultimate touchstone in every preemption case." *Id.* (internal quotation marks omitted).  Although the text of the statute being interpreted is always the best evidence of Congress' purpose, the overall structure and purpose of a statute can also demonstrate Congress' intent to preempt state law. *See Medtronic, Inc. v. Lohr*, 518 U.S. 470, 486 (1996).

Second, the Supreme Court has instructed courts considering federal preemption to assume that "the historic police powers of the States were not to be superseded by [federal law] unless that was the clear and manifest purpose of Congress." *Wyeth*, 129 S. Ct. at 1194-95 (internal quotation marks omitted).  That is because federal courts' "respect for the States as 'independent sovereigns

---

[5] The Supremacy Clause provides that the "Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

in our federal system' leads us to assume that 'Congress does not cavalierly preempt state-law causes of action.'" *Id.* at 1195 n. 3 (quoting *Lohr*, 518 U.S. at 485).

The presumption against preemption is especially strong where preemption would apply to a "field which the States have traditionally occupied, such as protecting the health and safety of their citizens." *Anderson v. Sara Lee Corp.*, 508 F.3d 181, 192 (4th Cir. 2007) (internal quotation marks omitted). In *Wyeth*, the Supreme Court expressly reiterated that the presumption against federal preemption applies even in those areas long occupied by federal regulation, because the presumption against preemption "accounts for the historic presence of state law," and is not dependent on the absence of federal regulation. *Wyeth*, 129 S. Ct. at 1195 n.3 (rejecting the argument that the presumption was inapplicable "because the Federal Government has regulated drug labeling for more than a century"). Thus, the presumption against preemption has full force here — even though the federal government has regulated national banks for more than a century — because the doctrine would displace state consumer-protection statutes, which fit squarely within the States' traditional police powers to protect the well being of their own citizens. *See, e.g.*, *Rice v. Sante Fe Elevator Corp.*, 331 U.S. 218, 230 (1947); *Gen. Motors Corp. v. Abrams*, 897 F.2d 34, 42-43 (2d Cir. 1990) ("Because consumer protection law is a field traditionally regulated by the states, compelling evidence of an intention to preempt is required in this area.").[6]

Moreover, the presumption against preemption is amplified in certain other circumstances. For instance, courts are "more reluctant to infer preemption from the comprehensiveness of

---

[6] The presumption against preemption would not hold where the States have attempted to directly regulate national banking itself, as opposed to consumer protection writ large, because the regulation of *national banks* — distinguished from the protection of state consumers through generally applicable legislation — is not a field traditionally occupied by the States. *Cf. Nat'l City Bank of Ind. v. Turnbaugh*, 463 F.3d 325, 330-31 (4th Cir. 2006).

regulations than from the comprehensiveness of statutes." *Abbot v. Am. Cyanamid Co.*, 844 F.2d 1108, 1112 (4th Cir. 1988). Additionally, the presumption against preemption is "stronger still against preemption of state remedies . . . when no federal remedy exists." *See Anderson*, 508 F.3d at 192 (internal quotation marks omitted). In sum, in every preemption case, the court must identify some concrete evidence demonstrating that "the clear and manifest purpose of Congress" was to override state law. *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992) (internal quotation marks omitted).

    b.    Types of Preemption

As to the substance of preemption, there are three manifestations of the doctrine: field preemption, express preemption, and conflict preemption. *See H&R Block E. Enters., Inc. v. Raskin*, 591 F.3d 718, 722 (4th Cir. 2010). Field preemption — the pinnacle of federal preemption — is a narrow category, applicable only where the "federal scheme of regulation of a defined field is so pervasive that Congress must have intended to leave *no room* for the states to supplement it." *City of Charleston, S.C. v. A Fisherman's Best, Inc.*, 310 F.3d 155, 169 (4th Cir. 2002) (emphasis added).[7] Congress and the OCC never intended to occupy the entire field of national banking regulation. To the contrary, Congress has always left national banks "subject to state laws of general

---

    [7] The doctrine of "complete preemption" is only distantly related, at best, to field preemption. Despite the linguistic similarity, complete preemption is not a distinct type of preemption at all, but rather is a jurisdictional rule positing that all claims on a given topic arise under federal law, thereby paving the way for removal of an action to federal court pursuant to 28 U.S.C. § 1441(b). *See Lontz v. Tharp*, 413 F.3d 435, 440 (4th Cir. 2005) ("Complete preemption is a jurisdictional doctrine, while ordinary preemption simply declares the primacy of federal law, regardless of the forum or the claim." (internal quotation marks omitted)); *see also Discover Bank v. Vaden*, 489 F.3d 594, 611 (4th Cir. 2007) (Goodwin, J., dissenting) ("The complete preemption doctrine thus works to treat a plaintiff's state *complaint* as federal from its inception, thus permitting removal."), *maj. op. rev'd*, 129 S. Ct. 1262 (2009).

application in their daily business," *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 11 (2007), and the OCC has explicitly disclaimed any desire to occupy the entire field of national banking, *see* Bank Activities and Operations; Real Estate Lending and Appraisals, 69 Fed. Reg. 1,904, 1,911 (Jan. 13, 2004); *see also Watkins v. Wells Fargo Home Mortg.*, 631 F. Supp. 2d 776, 783-85 (S.D. W. Va. 2008) (explaining why field preemption is inapplicable).

The second type of preemption — express preemption — arises "when Congress has clearly expressed an intention" to preempt state law. *College Loan Corp. v. SLM Corp.*, 396 F.3d 588, 595-96 (4th Cir. 2005). Finally, conflict preemption arises when "Congress did not necessarily intend preemption of state regulation in a given area but the particular state law conflicts directly with federal law or stands as an obstacle to the accomplishment of federal objectives." *A Fisherman's Best*, 310 F.3d at 169. Conflict preemption encompasses two subcategories. First, it can arise when "compliance with both federal and state regulations is a physical impossibility." *Hillsborough Cnty., Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713 (1985) (internal quotation marks omitted). Second, conflict preemption can occur when "state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (internal quotation marks omitted). The Fourth Circuit refers to this latter type of conflict preemption as "obstacle preemption." *Anderson*, 508 F.3d at 192.

The Supreme Court very recently refined the parameters of obstacle preemption. *See Williamson v. Mazda Motors of Am., Inc.*, No. 08-1314, slip op. at 5 (U.S. Feb. 23, 2011). In an earlier case, *Geier v. Am. Honda Motor Co.*, 529 U.S. 861 (2000), the Supreme Court had ruled that state tort law stood as an obstacle to the accomplishment of a significant federal regulatory objective (the preservation of a car manufacturer's choice to implement various passive restraint systems).

-9-

*Id.* at 886. As the *Williamson* Court emphasized, however, the doctrine of obstacle preemption turns on an essential threshold showing — that "a *significant objective* of [a] federal regulation" be identified. *Williamson*, slip op. 6. The Court could not identify any such objective in *Williamson*, concluding instead that the policy choice set forth in the federal regulation (whether to install shoulder seatbelts in rear, middle seats) did not represent "a significant regulatory objective" of Congress. *Id.* at 8. Consequently, a state tort claim, even with the potential to constrict that choice, did *not* stand as an obstacle to the accomplishment of the full purposes and objectives of federal law and was not preempted. *See id.* at 12.

c.      Preemption by Regulation

As explained above, federal preemption can be implicated even where a statute is silent as to preemption. That concept often arises when an agency has spoken to the issue of preemption through the rulemaking process, an area of the law to which the Supreme Court recently brought some much-needed clarity. *See Wyeth v. Levine*, 129 S. Ct. 1187, 1200-04 (2009). In *Wyeth*, the Court articulated the precise level of deference that courts should apply to an administrative agency's views on preemption. *See id.*

The *Wyeth* Court outlined two distinct scenarios. The first arises where an "agency regulation with the force of law" preempts state law. *See id.* at 1200 (citing *Hillsborough*, 471 U.S. at 713). Where that is the case, courts are to conduct their "own conflict [preemption] determination, relying on the substance of state and federal law and not on agency proclamations of preemption." *Id.* at 1200-01. The Court offered three examples of agency regulations that bear the force of law necessary to preempt state law. *See id.* at 1201 n.9 (citing 47 U.S.C. §§ 253(a), (d) (2000); 30 U.S.C. § 1254(g) (2006); 49 U.S.C. § 5125(d) (2000)). What is notable about these statutory provisions is

-10-

that, unlike the NBA, each expressly mentions preemption. *See, e.g.*, 47 U.S.C. § 253(d) (giving the FCC the power to "preempt the enforcement" of any inconsistent state or local requirement). Notably, although Congress conferred explicit rulemaking authority on the OCC in multiple portions of the NBA, Congress did not confer any *preemptive* rulemaking authority on the OCC. Accordingly, the circumstances here do not fit within *Wyeth's* first scenario.

In the second scenario outlined in *Wyeth*, a court is faced with "an agency's mere assertion that state law is an obstacle to achieving its statutory objectives." 129 S. Ct. at 1201. The question presented in *Wyeth* was what weight to give to the agency's views in that context. The Court explained that it had never deferred to an "agency's *conclusion* that state law is preempted," but rather had only "attended to an agency's explanation of how state law affects the regulatory scheme." *Id.* The Court summarized the weight to be given to an agency's views on preemption as follows:

> While agencies have no special authority to pronounce on preemption absent delegation by Congress, they do have a unique understanding of the statutes they administer and an attendant ability to make informed determinations about how state requirements may pose an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.   The weight we accord the agency's explanation of state law's impact on the federal scheme depends on its thoroughness, consistency, and persuasiveness. *Cf. United States v. Mead Corp.*, 533 U.S. 218, 234-37 (2001); *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).

*Id.* (internal quotation marks and citations omitted). As explained below, the OCC's preemption regulation represents the agency's attempt to describe how various categories of state law stand as an obstacle to the purposes and objectives embodied in the NBA.  Given that context, therefore, it is only appropriate to accord the OCC's preemption analysis *Skidmore* deference. *See Wyeth*, 129 S. Ct. at 1201.[8]

_____

[8] The fact that the Supreme Court applied *Chevron* deference to an OCC regulation in *Cuomo*
(continued...)

-11-

2.      *Preemption Under the NBA and the OCC Regulations*

Since the early years of the Republic, the Supreme Court has recognized that federal law pertaining to national banking necessarily supersedes conflicting state law.  *See McCulloch v. Maryland*, 4 Wheat. 316 (1819).  Although the original national bank at issue in *McCulloch* was short-lived, the concept reemerged and Congress enacted the NBA in 1864.  *See Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 10 (2007).[9]

The NBA contains no express preemption provision.  Instead, the NBA provides national banks with several broad powers and vests the OCC with the power to oversee national banks.  Pursuant to that framework, federal courts have long recognized that Congress' purpose in enacting the NBA was to "shield[] national banking from unduly burdensome and duplicative state regulation."  *Id.* at 11.  Thus, national banks "are subject to state laws of general application in their daily business to the extent such laws do not conflict with the letter or the general purposes of the

_____

[8](...continued)
*v. Clearing House Ass'n, LLC*, 129 S. Ct. 2710, 2715 (2009), is not controlling here.  The *Cuomo* Court actually ruled that the OCC's interpretation was *not* entitled to *Chevron* deference.  *See* 129 S. Ct. at 2719.  More importantly, *Cuomo* (like *Watters*) concerned § 484(a) of the NBA, which has been read by the Court as a preemption provision.  *See id.* at 2715.  Thus, *Cuomo* is distinguishable from the circumstances presented here, *i.e.*, where the court is faced with the OCC's declaration of preemption in the context of statutory silence.  *See id.* at 2732 (Thomas, J., concurring in part and dissenting in part) ("The preemption of state enforcement authority [under § 484(a)] . . . thus follows from the statute itself — not agency action."); *see also* William Funk, *Judicial Deference and Regulatory Preemption by Federal Agencies*, 84 TUL. L. REV. 1233, 1242 (2010) (distinguishing between the case where a "statute grants the agency substantive rulemaking authority and contains an express preemption provision applicable to those regulations," and the situation in which a "statute grants to the agency substantive rulemaking authority but without an applicable express preemption provision").

[9] Technically speaking, "the NBA" only refers to the original act of 1864.  *See* 12 U.S.C. § 38.  In this opinion, however, I follow the parties' lead and use "the NBA" to refer to assorted provisions of Title 12, many of which were more recently added to the U.S. Code.

-12-

NBA." *Id.* at 12.  In other words, the States may "regulate the activities of national banks where doing so does not prevent or significantly interfere with the national bank's or the national bank regulator's exercise of its powers." *Id.*  When, by contrast, state action "significantly impair[s] the exercise of authority, enumerated or incidental under the NBA, the State's regulations must give way." *Id.*

Since its earliest formulation, the NBA has vested national banks with "all such incidental powers as shall be necessary to carry on the business of banking."  12 U.S.C. § 24 Seventh.[10] Congress did not, however, initially confer the unlimited power to engage in residential real estate lending on national banks.  Although Congress gradually expanded the limited real estate lending powers of national banks over time, it was not until the enactment of the Garn-St. Germain Depository Institutions Act of 1982 that national banks first enjoyed the broad power to engage in real estate lending.  *See* Pub. L. No.  97-320, Title VIII, § 403, 96 Stat. 1510-11 (codified at 12 U.S.C. § 371(a)).[11]

To complement the broad powers granted to national banks, Congress conferred equally broad rulemaking authority on the OCC, primarily in § 371(a) itself, which subjects national bank real estate lending to such "restrictions and requirements" as the OCC shall prescribe.  Furthermore, the NBA confers explicit rulemaking authority on the OCC "to prescribe rules and regulations to

---

[10] It is undisputed here that the mortgage servicing business of BAC, which is an operating subsidiary of Bank of America, is treated as a national bank for purposes of the NBA and the OCC's implementing regulations. *See, e.g.*, *Watters*, 550 U.S. at 21.

[11] Section 371(a) provides that "[a]ny national banking association may make, arrange, purchase, or sell loans or extensions of credit secured by liens on interests in real estate, subject to section 1828(*o*) of this title and such restrictions and requirements as the Comptroller of the Currency may prescribe by regulation or order." 12 U.S.C. § 371(a).

carry out the responsibilities of the office."  12 U.S.C. § 93(a).  And in yet another portion of the statute, Congress directed the appropriate federal banking agencies (including the OCC) to adopt uniform regulations governing real estate lending.  *See* 12 U.S.C. § 1828(*o*).  Of critical importance, however, is that none of these various statutory provisions mentions — or even directly hints at — preemption.

Nevertheless, conflict preemption has always been ensconced in the NBA's regulatory scheme, because the NBA's statutory grants of authority, whether specifically enumerated or merely incidental to other powers, have been universally understood as not being "limited by, but rather ordinarily preempting, contrary state law."  *Barnett Bank of Marion Cnty., N.A. v. Nelson*, 517 U.S. 25, 32 (1996).  Thus, when the OCC first promulgated a distinct preemption regulation in 1984, it was not promulgating a wholly new preemption provision, but rather was attempting to summarize and distill existing conflict preemption precedent.  *See* 12 C.F.R. § 34.2 (1984); Real Estate Lending by National Banks, 48 Fed. Reg. 40,698, 40,700 (Sept. 9, 1983).[12]  By 1996, the OCC had further clarified its preemption analysis, but it continued to emphasize that it was simply applying existing principles of conflict preemption.  In fact, the OCC's preemption regulation noted that the agency would "apply recognized principles of Federal preemption in considering whether State laws apply to other aspects of real estate lending by national banks."  12 C.F.R. § 34.4(b) (1997).

_____

[12]  In its initial preemption regulation, the OCC explained that national banks could engage in real estate lending, "without regard to state law limitations" regarding five specific aspects of the lending process:  the amount of a loan in relation to the appraised value of the real estate; the repayment schedule; the term to maturity of the loan; the aggregate amount of funds which could be loaned upon the security of real estate, and; the covenants and restrictions which must be contained in a lease to qualify the leasehold as acceptable security for a real estate loan.  *See* 12 C.F.R. § 34.23(a) (1984).

Effective February 12, 2004, the OCC promulgated the current version of the preemption regulation, which provides that "state laws that obstruct, impair, or condition a national bank's ability to fully exercise its Federally authorized real estate lending powers do not apply to national banks." 12 C.F.R. § 34.4(a) (2010). The regulation states that national banks may make real estate loans "without regard to state law limitations concerning" fourteen categories of law. *Id.* § 34.4(a). One of those subject areas covering "[p]rocessing, origination, servicing, sale or purchase of, or investment or participation, in mortgages," is at issue here. *Id.* § 34.4(a)(10). The regulation also sets forth a savings clause, stipulating that state laws on certain enumerated subjects are "not inconsistent with the real estate lending powers of national banks and apply to national banks to the extent they only incidentally affect the exercise of national banks' real estate lending powers." *Id.* § 34.4(b). Included on § 34.4(b)'s list of non-preempted areas are state laws on contracts, torts, criminal law, and "[a]ny other law the effect of which the OCC determines to be incidental to the real estate lending operations of national banks or otherwise consistent with the powers and purposes set out in § 34.3(a)." *Id.* § 34.4(b)(9).

There is another statute and regulatory framework — the Home Owners' Loan Act of 1993 ("HOLA") and the regulations promulgated thereunder by the Office of Thrift Supervision (the "OTS") — that comes up with some frequency in cases arising from real estate lending. HOLA and the OTS regulations govern federally regulated savings and loans, also known as thrifts, but they do not apply to national banks. Judicial opinions considering NBA and OCC preemption often borrow from the OTS's preemption regulation because it is similar in many respects to the OCC's regulation. *See, e.g.*, *Lomax v. Bank of Am., N.A.*, 435 B.R. 362, 369-70 (N.D. W. Va. 2010); *Frye v. Bank of Am., N.A.*, No: 3:10-cv-47, 2010 WL 3244879, at *5 (N.D. W. Va. Aug. 16, 2010).

I do not find it appropriate to import wholesale the HOLA and OTS analysis into the context of NBA and OCC preemption. *See Agustin v. PNC Fin. Servs. Grp., Inc.*, 707 F. Supp. 2d 1080, 1097 (D. Haw. 2010) ("[M]any courts have cautioned against applying the OTS/HOLA analysis in the OCC context.").  Significantly, the OTS's preemption regulation and many of the authorities construing that regulation and HOLA preemption arose before the Supreme Court clarified in *Wyeth* the level of deference to be applied to agency views on preemption. *See, e.g.*, *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153-54 (1982) (describing the preemptive effect of federal regulations).  It appears to me that Justice Blackmun's analysis in *de la Cuesta* of the standard of review to be applied to preemptive agency regulations, *id.*, is in direct conflict with the majority opinion in *Wyeth*, 129 S. Ct. at 1200-01.  Moreover, not only are the OTS regulations and the authorities interpreting those regulations predicated on an entirely different statute, but there are also two critical differences between the OCC and OTS preemption regulations.   First, the OTS has "occupied the field" of savings and loan real estate lending, whereas the OCC has not. *Compare* 12 C.F.R. § 560.2(a)(2010), *with* 12 C.F.R. § 34.4 (2010); *see also Bank of Am. v. City & Cnty. of San Francisco*, 309 F.3d 551, 560 (9th Cir. 2002) ("[T]he regulation of federal saving associations by the OTS is so pervasive as to leave no room for state regulatory control." (internal quotation marks omitted)).  Second, the OTS regulation  is worded differently than the OCC regulation, as, for example, the OTS's preemption regulation exempts broader categories of state laws. *Compare* 12 C.F.R. § 560.2(c)(1) (excluding from preemption "contract and commercial law"), *with id.* § 34.4(b)(1) (noting that state law on "contracts" apply to national banks).

Accordingly, I will appropriately confine my analysis today to the issues presented. My inquiry is whether the NBA and the pertinent OCC regulations preempt the plaintiff's WVCCPA claims. I will not consider the scope of preemption under HOLA and the OTS's regulations.

3.      *Application to the Plaintiff's WVCCPA Claims*

Before deciding whether the plaintiff's claims are preempted, it is helpful to nail down the type of preemption implicated here. BAC argues that express preemption is involved, whereas the plaintiff never mentions the types of preemption. I, however, am convinced that only conflict preemption applies. *See Agustin*, 707 F. Supp. 2d at 1094 ("[E]xpress preemption is inapplicable, as the NBA does not expressly preempt generally applicable laws regarding unfair business practices . . . ."); *Munoz v. Fin. Freedom Senior Funding Corp.*, 567 F. Supp. 2d 1156, 1162 n.4 (C.D. Cal. 2008) ("The NBA . . . is structured in such a way as to only implicate conflict preemption.").

In my view, based on the history outlined above of the NBA and the OCC's promulgation of preemption regulations thereunder, all the OCC set out to do in adopting § 34.4 was to codify the principles of NBA conflict preemption that had percolated through the federal courts over several decades.[13] That only conflict preemption applies to national banking is illustrated by three additional points. First, the NBA has always lacked an express preemption provision, but the notion of preemption in this area harkens back to the days of *McCulloch v. Maryland*, 4 Wheat. 316 (1819), long before the OCC first drafted a single preemption regulation. This history indicates that something other than express preemption must be at work. *See Davis v. Elmira Sav. Bank*, 161 U.S.

---

[13] BAC relies on a Central District of California case to buttress its express preemption argument, *see Davis v. Chase Bank U.S.A., N.A.*, 650 F. Supp. 2d 1073, 1080-82 (C.D. Cal. 2009), but I am not persuaded by the analysis in that opinion. Not only did the court in *Davis* fail to analyze the various types of preemption, but the court's analysis also turned on an OCC regulation (12 C.F.R. § 7.4008) that explicitly does *not* apply to real estate lending. *Id.*

275, 290 (1896) (observing that non-conflicting "general and undiscriminating state laws" can be applied to national banks). Second, the OCC itself has opted to classify § 34.4 as the distillation of existing precedent, rather than as the promulgation of new preemption laws.[14] Finally, in the Supreme Court's seminal decision on NBA preemption, the Court chose not to emphasize § 34.4 or any other OCC regulation, but instead focused on the actual text of the NBA and the long line of precedents construing its provisions. *See Watters*, 550 U.S. at 11 (applying the rhetoric of conflict preemption in observing that national banks are bound by state laws that "do not conflict with the letter or the general purposes of the NBA").

Because neither field preemption nor express preemption is applicable, I will restrict my analysis to whether the plaintiff's WVCCPA claims are preempted under principles of conflict preemption. The "direct conflict" subcategory of conflict preemption is inapposite because it would not be physically impossible to comply with both the federal regulatory framework and state consumer-protection laws of general applicability (such as the WVCCPA). As a result, we are left to consider obstacle preemption, which requires BAC to show that the plaintiff's WVCCPA claims stand as an "obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hillsborough*, 471 U.S. at 713.

---

[14] The best illustration of the OCC's limited view of § 34.4 comes from the agency's own statement in the Federal Register in 2004: "The words of the final rule, which are drawn directly from applicable Supreme Court precedents, better convey the range of effects on national bank powers that the Court has found to be impermissible. The OCC intends this phrase as the distillation of the various preemption constructs articulated by the Supreme Court . . . and not as a replacement construct that is in any way inconsistent with those standards." Bank Activities and Operations; Real Estate Lending and Appraisals, 69 Fed. Reg. 1,904, 1,910 (Jan. 13, 2004).

The plaintiff asserts two claims under the WVCCPA, a statute of general applicability that covers a much broader swath of activity than national banking.[15]  In Count II of the Complaint, pursuant to West Virginia Code § 46A-2-127, the plaintiff alleges that BAC misrepresented that she was in default when in fact she was not.  In Count III, the plaintiff contends that BAC's foreclosure attempts amounted to unconscionable and unfair debt collection practices, which she alleges violated § 46A-2-128 of the Code.  In response, BAC states that "these claims directly implicate BAC's processing, servicing, and/or participation in Plaintiff's mortgage, the bank's disclosure of information, and the loan terms related to Plaintiff's loan agreement, including the imposition of charges and fees."  (Mem. in Supp. of Summ. J. [Docket 23], at 15.)  Under BAC's analysis, the plaintiff's claims fit squarely within the preemptive scope outlined in § 34.4(a) of the OCC's preemption regulation, and the claims do not fall within the language of the savings clause contained in § 34.4(b).  I disagree.

BAC offers very little to support its obstacle preemption analysis.  It relies heavily on those cases construing or borrowing from HOLA and OTS preemption, but, as explained above, I find those authorities to be unhelpful here.  BAC omits any discussion of the proper standard of deference to be applied to the OCC's preemption analysis, taking instead the OCC's preemption provision at face value, as if it was enacted by a bicameral Congress and presented to the President for signature.

---

[15] The WVCCPA is undoubtedly a law of general applicability.  Section 46A-2-127, entitled "Fraudulent, deceptive or misleading representations," and Section 46A-2-128, covering "Unfair or unconscionable means," both apply to any "debt collector," which is "any person or organization engaging directly or indirectly in debt collection."  W. Va. Code § 46A-2-122(d). "Debt collection," in turn, is defined as "any action, conduct or practice of soliciting claims for collection or in the collection of claims owed or due or alleged to be owed or due by a consumer."  *Id.* § 46A-2-122(c). If not readily apparent from these broad definitions, the Supreme Court of Appeals of West Virginia has made clear that the reach of these provisions is quite broad.  *See Thomas v. Firestone Tire & Rubber Co.*, 266 S.E. 2d 905, 908-09 (W. Va. 1980).

In light of *Wyeth*, however, that is no longer a tenable view of the law. Rather, because the OCC has "no special authority to pronounce on preemption absent delegation by Congress," I will only accord the OCC's view as much force as it is entitled to in light of its thoroughness, consistency, and persuasiveness. *See Wyeth*, 129 S. Ct. at 1201.

It is unclear whether the OCC would even maintain, if given the opportunity to do so, that the NBA preempts the plaintiff's WVCCPA claims.[16] Part of the problem is that, to my knowledge, the OCC has never settled on the concrete position espoused by BAC, and, because the OCC is not a party to this action, I do not have the benefit of its views on the matter. Nevertheless, to the extent that the OCC would subscribe to BAC's preemption analysis, the OCC's position would be entitled to very little deference post-*Wyeth*. Put simply, nothing in the text or inherent in the purposes of the NBA demonstrates Congress' intent to displace state consumer-protection laws of general applicability. Moreover, that has never been the view of those courts that have interpreted the NBA. *See Watters*, 550 U.S. at 11 (explaining that national banks "are subject to state laws of general application" that do not conflict with the NBA). In short, I am firmly convinced that, while the OCC's regulation may be a helpful tool in distilling 150 years' worth of NBA preemption jurisprudence, it is not the actual stuff from which conflict preemption arises.

---

[16] Adding yet another layer of complexity to this issue, a 1994 amendment to the NBA requires the OCC "to jump through additional procedural hoops (specifically, notice and comment, even for opinion letters and interpretive rules)" before preempting state law. *Watters*, 550 U.S. at 39 n. 22 (Stevens, J., dissenting); *see* 12 U.S.C. § 43(a). In particular, § 43(a) requires the OCC to publish in the Federal Register "a description of each State law" that it is considering preempting. 12 U.S.C. § 43(a)(1). As there is no indication that the OCC ever took that step with respect to the WVCCPA provisions implicated here, it is even more doubtful that the OCC's regulation could possibly have any formal preemptive effect.

Instead, I look to the intent of Congress, as best demonstrated by the text of the NBA, and conclude that there is no significant federal regulatory objective at play that would merit displacing the generally applicable state consumer-protection claims presented in the Complaint.  It is apparent that even if BAC must comply with West Virginia's statutory prohibitions on misrepresentations and unconscionable conduct in the field of debt collection (as every debt collector doing business in West Virginia must also do), BAC will remain free to engage in the federally regulated and sanctioned business of mortgage servicing.  Obstacle preemption is not triggered merely because West Virginia's broad statute prohibiting unlawful forms of debt collection happens to ensnare certain practices of national banks.

Most significantly, despite BAC's conclusory statement that the plaintiff's WVCCPA claims "implicate" its mortgage servicing business, BAC has not adequately explained how complying with the WVCCPA provisions at issue here would disrupt the workings of that business.[17]  In my view, forcing BAC to comply with the WVCCPA provisions identified in the Complaint will not stand as an obstacle to the significant regulatory objectives underlying the NBA and the relevant OCC regulations — allowing national banks and their operating subsidiaries to engage in mortgage servicing free from unduly burdensome state regulation.  It is not as if, by contrast, West Virginia has attempted to outlaw mortgage servicing as a whole or even sought to place any direct limits on the nature of that business.

---

[17] It is important to emphasize that my analysis does not immunize the entire WVCCPA from federal preemption, nor does the analysis even foreclose preemption of a claim brought under the two WVCCPA provisions at issue in the Complaint.  Rather, my holding today is simply that the NBA and the OCC regulations, as applied in this case, do not preempt the plaintiff's claims. *See, e.g.*, *H&R Block*, 591 F.3d at 722-23 (explaining that obstacle preemption is limited to an actual conflict between federal law and state law "as applied" in a particular case).

-21-

Rather, West Virginia's legislature, in enacting a broad consumer protection statute of general application, has attempted to protect West Virginia citizens from certain unscrupulous debt collection practices. *See Monroe Retail, Inc. v. RBS Citizens, N.A.*, 589 F.3d 274, 281 (6th Cir. 2009) ("We find that the NBA does not preempt general state laws governing the rights of all entities, not just Banks . . . ."). I have found nothing in the NBA or the relevant OCC regulations, including the OCC's specific preemption provision, to indicate that Congress sought to displace West Virginia's complementary and non-contradictory remedial scheme. *See Augustin*, 707 F. Supp. 2d at 1096 (concluding that "claims that arise from generally applicable duties such as contractual obligations and a broad duty to refrain from deceptive acts" are not preempted under the NBA). Thus, applying the pertinent WVCCPA provisions to BAC in a private cause of action would not significantly impair BAC's enumerated or incidental real estate lending powers under the NBA. *See Watters*, 550 U.S. at 11.

As discussed above, BAC was required in this case to rebut the basic assumption that Congress does not cavalierly displace the States' protection of their citizens through generally applicable consumer-protection statutes. The presumption against preemption is fortified in this case because no federal remedy exists for the plaintiffs in these circumstances. BAC has fallen far short of rebutting that presumption, and I conclude that the WVCCPA provisions implicated by Counts II and III are not an obstacle to the policies and purposes underlying the federal regulation of national banks. As such, the plaintiff's WVCCPA claims are not preempted and BAC's Motion for Summary Judgment on that basis is **DENIED**.

**B.    Evidentiary Arguments**

BAC further contends that, even if the plaintiff's WVCCPA claims are not preempted, BAC is entitled to summary judgment because these claims are not supported by the evidence. This argument is unavailing. The record contains ample correspondence between the plaintiff and BAC regarding the status of the plaintiff's loan, potential foreclosure, and modification of the plaintiff's loan, all of which indicates a dispute as to the status of the plaintiff's loan at the time BAC began foreclosure proceedings. Accordingly, I **FIND** that there are genuine disputes as to the material facts underlying the plaintiff's WVCCPA claims, and, accordingly, BAC's Motion for Summary Judgment on that basis is **DENIED**.

## IV.    Conclusions

Pursuant to the foregoing reasons, the court **DENIES** BAC's Motion for Summary Judgment [Docket 22]. The court **DENIES** the plaintiff's Motion to Supplement Memorandum of Law in Response to Defendant's Motion for Summary Judgment [Docket 32] as moot.

The court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party and to post a copy of this published opinion on the court's website, *www.wvsd.uscourts.gov*.

ENTER:      March 11, 2011

Joseph R. Goodwin, Chief Judge